# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 16, 2002 Session

## STATE OF TENNESSEE v. LESLIE BRIAN WILLIS

### Direct Appeal from the Circuit Court for Robertson County
### No. 97-0381     John H. Gasaway, III, Judge

---

### No. M2001-00634-CCA-R3-CD - Filed June 30, 2003

---

Following the reversal of his first degree felony murder conviction due to insufficient evidence to support the predicate felony, the defendant, upon remand, was convicted by a jury of second degree murder. On this appeal, he raises the following issues:

   (1) Whether the evidence was sufficient to sustain a conviction for second degree murder;

   (2) Whether second degree murder is a lesser included offense of first degree felony murder;

   (3) Whether the trial court erred in allowing the State to recall witness William Alley during its case in chief;

   (4) Whether the trial court erred in allowing the testimony of TBI Agent Mike Breedlove, in violation of Tenn. R. Crim. P. 404(b), that the defendant threatened to break his neck; and

   (5) Whether the trial court erred in sentencing the defendant to the maximum twenty-five years.

We affirm the defendant's conviction for second degree murder.

### Tenn. R. App. P. 3 Appeal as of Right; Conviction Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Paul J. Bruno and Rayburn McGowan, Jr., Nashville, Tennessee, for the appellant, Leslie Brian Willis.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber and Dent Morriss, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

Jamie Marable was last seen in the early morning hours of September 9, 1990, with friends, including the defendant, Leslie Brian Willis, at the Golden Jukebox bar in Clarksville, Tennessee.[1] Three days later, her body was found near Port Royal State Park.

After a lengthy investigation, the defendant was indicted in July 1997, on two counts of first degree murder; one count of first degree felony murder, the other count first degree premeditated murder. A jury acquitted him of first degree premeditated murder and convicted him of first degree felony murder, the underlying felony being rape, and sentenced him to life in prison. The defendant appealed his conviction, arguing, *inter alia*, that the evidence was insufficient to support the underlying felony of rape and, therefore, the felony murder conviction should be overturned. This court agreed, reversing the felony murder conviction and remanding the case for the defendant to be tried for second degree murder. See State v. Willis, No. 01C01-9802-CC-00068, 1999 Tenn Crim. App. LEXIS 715, (Tenn. Crim. App. July 15, 1999, at Nashville) perm. to appeal denied (Tenn. Oct. 23, 2000).

Prior to the retrial, the defendant moved for a dismissal, contending that second degree murder was not a lesser included offense of first degree felony murder. The motion was denied. On September 16, 2000, after a five-day jury trial, the defendant was found guilty of second degree murder and later sentenced to twenty-five years with the Tennessee Department of Correction. The defendant's motion for a new trial was denied. This timely appeal followed. The defendant raises the following issues:

(1) Whether the evidence was sufficient to sustain a conviction for second degree murder;
(2) Whether second degree murder is a lesser included offense of first degree felony murder;
(3) Whether the trial court erred in allowing the State to recall witness William Alley during its case in chief;
(4) Whether the trial court erred in allowing the testimony of TBI Agent Mike Breedlove, in violation of Tenn. R. Crim. P. 404(b), that the defendant threatened to break his neck; and
(5) Whether the trial court erred in sentencing the defendant to the maximum twenty-five years.

After a careful review of the record, we affirm the conviction.

---

[1] There will be a multitude of testimony about the evening in question. The evening began on September 8, 1990, and continued into the early morning hours of September 9, 1990. Unless specifically noted otherwise, evidence referring to the night in question will refer to the overall evening, spanning the late September 8 hours into the early September 9 hours.

# I-Sufficiency of the Evidence

The defendant contends the evidence was insufficient to support his conviction for second degree murder. When sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

Importantly, although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). However, in order for this to occur, the circumstantial evidence must be not only consistent with the guilt of the accused, but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." Id. (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

While following the above guidelines, this court must remember that the jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); see also Gregory, 862 S.W.2d at 577; State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); Pruitt, 460 S.W.2d at 391.

Second degree murder was defined at the time of this offense as (1) A knowing killing of another; or (2) A killing of another which results from the unlawful distribution of any Schedule I or Schedule II drug when such drug is the proximate cause of the death of the user. Tenn. Code Ann. § 39-13-210(a). This case was decided based on circumstantial evidence. The evidence introduced at trial was lengthy, yet we need to examine it at some length to discern if a rational jury could have convicted the defendant based upon it. Relevant testimony was as follows.

## Trial Evidence

**David Riggins**, Director of Planning with the Clarksville Montgomery County Planning Commission, prepared and introduced a map of the Montgomery County/Robertson County line area. The map included the Port Royal area, Joe B's bar in downtown Clarksville, the Golden Jukebox and Greenfield Trucking Company. He said the county line followed the center of the Red River and the center of Sulphur Fork Creek and then runs due south from that point. He testified that

it would take approximately "twenty minutes or so" to get from downtown to the park (Port Royal), utilizing either of what he described as the couple of routes to take. On cross-examination, he stated that based on the condition of the roadway, one of the possible routes *could* take longer.

**William Alley** was a part-time farmer in 1990 near the Robertson/Montgomery county line in the Port Royal area. He said he owned property in both Montgomery and Robertson County. Occasionally, he said that there would be some graffiti on his barn. He said he was in the habit of checking the farming fields "just about every day." He said that in September of 1990, "they" were building a new road and bridge across Sulphur Fork Creek, but on the Sunday morning in question, that road was not officially open yet. He identified Greenfield Trucking Company as doing the paving work. He said there were some barricades on the road and some equipment parked on the bridge, and he noticed some "tracks" in the field. He recollected it was rainy around that time. He said he noticed the entrance tracks were very "normal," very shallow, with no skids and spins, and they stopped about twenty yards from the Greenfield equipment. He estimated the tracks to be about forty to fifty yards off the road. Mr. Alley testified to the presence of a different set of tracks than the entrance tracks and described these as deeper and not straight, but "zig zag." He testified that the tracks were not there the day before. He said the width of the tracks "seemed to be from a full-size (Chevrolet type) vehicle."

Mr. Alley testified that he began to smell something on that Tuesday, but he thought it was a deer or something of that nature. On Wednesday, the smell was still there, and he found the victim's body about ten or twelve feet off the road, down in a depression. He said that at night, if the lights were turned off, you would be unable to see a vehicle parked where he found the body. He said that on Sunday, there was brush and timber in the area and that a person at a nearby intersection would not be able to see a vehicle parked in that area, but that the road had been graded and mowed that Monday and Tuesday.

On cross-examination, Mr. Alley testified that it is possible there are more visitors in the park area in the summertime and that more people come on to his property. He said he keeps an eye out for that and to see if people are driving on his property. He said that in September (1990), he was bringing in his tobacco crop, making about twenty trips along the road he lives on, and that he smelled the odor on Tuesday. He said the tracks in question that he saw were near the bridge, but the body was found closer to a barn across the street, probably 200 to 250 yards away. Mr. Alley said there was other equipment near the tracks, namely a low boy, a roller, a grader, maybe a one-ton truck and a Greenfield Supply tanker that he said was brought in on Monday. He said he did not see the vehicle that made the tracks in question. Additionally, he admitted he did not have the knowledge to determine whether tire tracks came from a Dodge truck or a Ford truck, but he knew the tracks in question were not from a Volkswagen.

**Regina Austin**, the victim's mother, testified that she last saw her daughter on the morning of September 8, 1990, and last spoke with her that night. She said the victim was living with her at the time. Ms. Austin identified two photographs, one taken in the summer of 1989, in which the victim was wearing a black onyx ring. Ms. Austin identified the ring as the one her mother gave to

her daughter and that her daughter wore it "all the time." Subsequently, on redirect examination, she said the ring in question was never recovered. On recross-examination, she said she was aware of her daughter pawning jewelry one time.

Ms. Austin testified that her daughter did not come home that Sunday morning, that she became worried by that evening, and that she called the Clarksville police on Monday. She said she then went out to different places with a picture of her daughter, asking people if they had seen her. She said she went to the defendant's apartment on that Tuesday evening . Upon telling the defendant that her daughter had not been seen since Saturday night, she said the defendant acted very calm, nonchalant, and unemotional, whereas everybody else had acted very concerned. She said the defendant told her that the last time he saw the victim was at Joe B's and she left with two men.

On cross-examination, Ms. Austin testified that she talked to several people after her daughter did not come home, but she did not talk to her daughter's boyfriend, Dwayne Clawson, because he was in jail. She said they (Clawson and her daughter) had a decent relationship, but they did argue, although she did not remember them fighting. She said she was aware of Raven "Snake" Frazier through his relationship with Clawson, and that, due to (Snake's) reputation, she demanded he never set foot on her property. She said he was an "undesirable" person. She further testified she knew who Brenda Huggins was, knew that Huggins and "Snake" Frazier were supposed to be boyfriend and girlfriend, but that her daughter did not hang around with Huggins. She said her daughter and Brian Johnson were good friends and that she (Ms. Austin) had never heard of the defendant until her daughter was missing. Furthermore, Ms. Austin testified that after her daughter's death, Brian Johnson was in possession of her daughter's purse and returned it to her on Sunday, September 9, 1990.

She said that Cecilia Delacey told her that the victim was with a man named "Hawaiian Brian" the last time she saw her. Ms. Austin's next-door neighbor told her that "Hawaiian Brian" was really the defendant and that was what led Ms. Austin to go to the defendant's apartment. She said he seemed polite at the time she went to his apartment . She said the defendant told her he had been with her daughter that Saturday night and had paid her way into Joe B's. She said he also told her he thought the victim went to the hospital with someone. Ms. Austin said she was aware of an incident that occurred that night at the Golden Jukebox, where her niece, Kelly Elliott, was hit in the head and had to go to the emergency room.

Ms. Austin testified that after talking with the defendant, she made some reward flyers seeking information about her daughter's killer. The initial reward offer was $1000. She said the reward grew over time, growing to $10,000 by September, 1992; to $25,000 in 1994; then to $26,500 in 1996 . Ms. Austin identified a reward poster from 1996, offering the $26,500 reward. Additionally, she identified one of the 1996 flyers as having the defendant's picture on it. She denied scattering any of those flyers in Kentucky, but admitted to distributing them in the Clarksville area. She said she was told some of the flyers were in Kentucky, although she said she did not take them there. She admitted to purchasing a billboard advertisement asking for information about the murder; to flying an airplane advertisement over Clarksville and Elkton, Kentucky; and to running

a newspaper advertisement in the Elkton, Kentucky newspaper. She said she was aware of where the defendant was living at that time.[2] Later, on redirect examination, when asked if she always suspected the defendant in this manner, she said she did not even know the defendant existed, only learning about him from what the police told her.

Ms. Austin testified that she was aware her daughter had a drug problem before her death and that she had received treatment at Vanderbilt.

**Jeffery Miller** was a doorman at Joe B's, a Clarksville club, on the night of September 8, 1990. He said the defendant was at the bar that night and he described him as a large man in a darker T-shirt that came in with the victim, who was wearing a white or lighter colored crop top shirt and a lightweight jacket. He said she had a pleasant, "happy go lucky" attitude. He described her as attractive with a nice figure. He said it was around twelve o'clock when they came in and that the defendant paid the cover charge for the both of them. He said they had been drinking and came from the "Jukebox," another bar located approximately five miles from Joe B's. He said that after arriving at his club, the defendant and the victim went out of his site for a while, then had conversations with each other and other people while near him. Specifically, he said the defendant had a conversation with a waitress form another club called "Texas East." Miller said he was talking to the victim when the defendant told her it was time to go. He said the victim then had the defendant finish her drink, and the couple left.

Miller said that the defendant came back to Joe B's at about 1:30 and asked him where the woman was who had been sitting behind him (behind Miller). Miller said he took that to mean the other girl that the defendant was talking to, not the girl he left with earlier. He said he told the defendant that she had left, and the defendant turned around and left.

On cross-examination, Mr. Miller said the girl did not have a purse with her and he did not recall any jewelry she was wearing. He said the victim's mother came to the club that Wednesday, before his interview with Detective Perry, asking if anyone knew or saw anything that weekend. He said he did not give the name of "Hawaiian Brian" to the victim's mother. He said the defendant did not appear to have been in any kind of fight or struggles the second time he came to the bar .

**Cleo Hogan** was a meteorologist in September, 1990. He testified that based on weather records for that area, the humidity in Port Royal State Park on the morning of September 9, 1990, would have been about 90 percent or higher for the hours between midnight to sunrise. Additionally, he stated the humidity would have been 90 percent or higher from September 10 through September 12. Based on weather records, he also testified there would have been rainfall during that time, sometimes moderate, sometimes thundershowers, and sometimes light. Similarly, he testified the temperatures were reported as a high of 91 degrees on September 9, 88 degrees on September 10, 92 degrees on September 11, and 78 degrees on September 12, due to the rain. He said the temperatures were five or six degrees above normal for that time of year.

---

[2] The defendant was living in Elkton, Kentucky at that time.

On cross-examination, he testified that it also rained on September 7 and 8. He said his readings were based on reports from Fort Campbell and Nashville and that he extrapolated in order to determine amounts of rainfall and weather conditions in Port Royal State Park, which is located between the two cities. He said he had no personal knowledge of rain and temperature at that time.

**Larry Green**, who was a commanding officer of the Criminal Investigation Division with the Robertson County Sheriff's Department, testified that on the evening of September 12, 1990, he went to the Alley farm on Port Royal Road where he initially observed the victim's body. In order to identify the body, he said he was provided with information about a missing young white female from Clarksville with a clothing description of black flat shoes, a pale denim skirt, a dark colored top, and a denim jacket with a belt. He said the clothing on the victim matched the description. He said they measured the distance from the victim's right heel to the roadway as 21 feet. The body was identified through dental records as Jamie Marable, the victim. He testified that the victim's shoes were later found approximately eighteen feet from the tree where the body was laying. Additionally, they found cigarette packs, beer cans, other cast-offs, and the victim's scalp. He testified that the victim's body was found with her head positioned downhill. Additionally, there was a fair amount of testimony as to the location of the body in reference to some of the nearby machinery and roadways, specifically that the body was 265 yards from some heavy equipment. Essentially, Detective Green testified that the body was not in the immediate proximity of either and was clearly in Robertson County.

He testified that on September 13, 1990, he went to Greenfield's quarry and searched the defendant's truck, a 1984 Chevrolet Silverado. He said he was looking for instrumentalities of the crime, including latent fingerprints. He said that he found none and that the truck was very clean and had been washed recently. He said it is "very unusual" to find a vehicle without latent prints. On September 20, 1990, Detective Green, along with Tennessee Bureau of Investigation ("TBI") agents, conducted another search of the defendant's truck. They collected dirt samples from the truck and the crime scene. He said the defendant's truck was parked in a nearby cave one day. Detective Green testified that they also searched the defendant's apartment, specifically looking for a pair of white basketball shoes, a lime green shirt, and a blue knit shirt. He said they did not find any of these clothing items.

Additionally, Detective Green testified they found a "Torx" screwdriver in a tool box in the defendant's utility room. He said they also conducted a consent search of the defendant's father's home in Elkton, Kentucky, where they found a lime green shirt with some writing on it in the defendant's bedroom. He said the samples collected were sent to the TBI and, ultimately, to the FBI in Washington.

Detective Green testified that he, along with Detective Bennett, interviewed the defendant on September 13, 1990, at the Clarksville Police Department. He said the defendant told him he knew the victim for a few months through her boyfriend, Dwayne Clawson. He said the defendant told him that on the evening in question, he started out at the home of Harold McCarver, a friend from the Clarksville Fire Department, watched football on television, met a few girls at McCarver's,

drank a little, and then went to the Golden Cue and then the Golden Jukebox, where he saw the victim. He said the defendant then told him he bought a few drinks for the victim and Cecilia Delacey, then took them to a different bar, Joe B's, where the defendant left the girls, went home to change clothes, went back to Joe B's for about 45 minutes, and then wound up back at the Golden Jukebox. Detective Green said the defendant told him he saw the victim when he went back to the Golden Jukebox, witnessed a fight, then later went home around 2:30 in the morning.

On cross-examination, Detective Green testified that when he went to interview the defendant at Greenfield Construction on September 13, 1990, the defendant was polite and was wearing a sleeveless shirt that did not reveal any scratches. He said he did not see any blood while looking at the defendant's truck. He said the manager at Greenfield Trucking told him that the defendant usually washed his truck every day. He said that the victim's lifestyle, that she ran with a pretty rough crowd, made the investigation difficult. He said some of her associates were into drug activity and reluctant to give information to the police.

Detective Green said his investigation revealed that "Snake" Frazier was a source of drugs for the victim and that he (Frazier) had a live-in girlfriend, Brenda Huggins. Additionally, Detective Green said the victim's family was very involved in the investigation, including them picking up some pieces of evidence. He said that the victim's family talking to potential witnesses could create some problems, but he did not have any concerns about it. He said that a family member acting as an interrogator could motivate witnesses to be sympathetic. He said he was concerned that the family could interfere with the investigation. He said he felt some of the witnesses were embellishing what they were telling him.

Detective Green admitted that during his investigation of the defendant on September 13, 1990, the defendant did not tell him that he was with Harold McCarver all night on the night in question and that he never used McCarver as an alibi.

On redirect-examination, Detective Green said there was no actual interference from the family, despite his concerns.

**Don Bennett**, who was a Detective Sergeant with the Robertson County Sheriff's office in September of 1990, testified that he recovered a T-15-sized Torx screwdriver as part of a search of the defendant's apartment. On cross-examination, he testified that the defendant was taken to the hospital for hair and pubic hair samples, but he did not recall anything else being recovered during the search.

**Ronnie Perry**, a detective with Robertson County in September of 1990, testified that he was at the scene where the victim's body was recovered and was present during the autopsy. He identified some articles of the victim's clothing given to him by the doctor performing the autopsy. He said he did not recall finding a purse or billfold at the scene.

Detective Perry testified that he interviewed the defendant on September 20, 1990. A tape of that interview was played for the jury.[3]

On cross-examination, Detective Perry said he interviewed the defendant with Detective Bennett. He said the defendant told him he had been watching football with Harold McCarver and later, he left to meet McCarver at the Golden Cue. Detective Perry said he thought the defendant was not being honest because he was afraid he was going to be prosecuted for drinking and driving. He said he did not interview Harold McCarver. He admitted that he interviewed several people who were at the bars on the night in question and that some of them had been drinking heavily that night. He said that he was aware there was a fight at the Golden Jukebox that night and that the defendant told him he left before the fight and then came back after the fight. He said he did not interview "Snake" Frazier nor Brenda Huggins but was aware they were being investigated. Initially, he said he did not remember interviewing the victim's sister, Gina Marable, but upon prompting, he did recall the interview, but not the content.

**Michael Greenfield** was the defendant's employer at Greenfield Trucking in September of 1990. Mr. Greenfield said they kept a number of different sized Torx screwdrivers, which were used on smaller scale GM trucks. He said that in September 1990, they were laying a road near the Port Royal bridge. He said they did not work on Saturday and Sunday, and despite barricades they set up, a truck could still get around them and drive down the road. He said that over the weekend in question, his company left a low boy, an oil distributor, a front end loader, and, possibly, a grader at the site. He said they had a "steam ginny" that was used for washing vehicles. He said he would not care if anyone ran their personal vehicle through the steam ginny nor would he care if anyone used the company tools to work on their personal vehicles.

On cross-examination, Mr. Greenfield said the defendant had worked for him for approximately five years and was an excellent worker. He said that the defendant treated his truck like "it was his first born child" and that he was obsessed with it and washed it every day. He said he let employees use the company's tools but that he was unaware of any Torx screwdrivers missing, only that the TBI has some that they never returned. He said some employees parked their vehicles in nearby caves when it was hot.

Mr. Greenfield said he went to the job site on Sunday, September 9, 1990, to check on the equipment. He said that in driving to the job site, he drove over some of the roads on which they had already worked. He said he met a friend there, had a beer, and then left the site heading toward Robertson County, after entering from Montgomery County. He said the defendant did not act unusual when he showed up for work on Monday.

---

[3] Neither the tape nor a transcript of the tape was provided in the record on appeal. It is the defendant's burden to submit a complete record so we are unable to consider what may have been the content of the interview.

Additionally, he testified that the defendant eventually quit working for him out of respect for the company because he was "getting hassled" on the job by the TBI and the police who were questioning him and by his co-workers.

**Robert Wendell Haynes** was a doorman at the Golden Jukebox in September 1990. He said that he knew the defendant by face and that the defendant came into the bar on the night of September 8, 1990. He said he was not sure when the defendant arrived at the bar, but he saw the defendant and the victim leave the bar sometime between 12:00 and 12:30. He said there was a fight at the bar around 1:00, but the defendant had left by that time. He said the victim came back around 2:00 that evening, after the fight, and then left again.

On cross-examination, Mr. Haynes said he did not see the defendant at the bar at closing time, but he did see the victim. He said the victim was wearing a black coat that covered almost everything. He testified he had a list of people that were not allowed into the bar and that the one name he could recall from that list was "Snake" Frazier. On redirect, he said he did not remember "Snake" Frazier being there that night and that he may have been confused as to the color of the victim's coat.

**Johnny Hunter**, a sergeant with the Identifications Division of the Metropolitan Nashville Police Department, testified that on September 17, 1990, he did some presumptive testing on a pair of shoes, a halter top, a jacket, a bra, some panties, and a skirt. He said he did not find any prints, but found some hair on the panties, the halter top, and the skirt. Additionally, he said he found a lot of hair on the jacket and a blue fiber in the panties. He then sent the evidence to the FBI. On cross-examination, he said that he was not asked to look for blood but that he would have collected any trace evidence that he found.

**Cary Oien**, with the Trace Evidence Unit of the FBI, testified that after analyzing the victim's clothing and reports from the police, he found the following: some blue nylon synthetic textile fibers in one shoe, some wool fibers from a jacket, some blue synthetic textile fibers in the panties, numerous different textile fibers in the bra and halter top, and numerous textile fibers including some blue nylon synthetic textile carpet-like fibers in a skirt and belt. He said there were positive comparisons to carpet samples taken from the defendant's vehicle.

On cross-examination, Mr. Oien testified that he did not do the original testing on these fibers, but examined all of them. He admitted to testifying 20 to 22 times on behalf of various prosecutions, and twice for criminal defendants. He said that during the original fiber testing in 1991, there were additional carpet samples submitted for testing, but when the evidence was resubmitted to him for testing in 1997, he received only carpet samples from the defendant's vehicle. Additionally, he said the only residential carpet samples he received were those from the defendant's residence. He said that based on his investigation where he found four fibers (from the victim) consistent with the defendant's vehicle carpet, it was impossible to say they came from the defendant's truck to the exclusion of all other similar trucks and there were certainly other vehicles that would have similar carpeting in them. Mr. Oien also said that eight items of debris, five

vacuumings, two gloves, two vests, and a set of waders taken from the defendant's truck and compared with known samples from the victim had no connection.

Mr. Oien testified that while the area of soil comparisons was not his area of expertise, four soil samples taken from the area compared with a soil sample taken from the defendant's truck showed no connection. Additionally, approximately 127 carpet standard samples taken from the defendant's home showed no connection to the victim. He said no blood was found from some jeans and a shirt taken from the defendant.

**Crystal Bickford** was the defendant's neighbor on Ridgeway Drive in September 1990. She said they were cordial with each other, and on one occasion, the defendant told her that he "took all his girlfriends to Port Royal." She said Port Royal State Park was a 25 to 30-minute drive from the apartment. She said that after the victim disappeared, the defendant stayed at the apartment only a week or so.

On cross-examination, Ms. Bickford testified that the defendant was fairly meticulous about keeping his truck clean. She admitted that the Port Royal area was a fairly common place for people to go and "party." She testified that she never physically saw the victim at the defendant's apartment, but that she knew she had been there because her boyfriend told her not to go over there because she (the victim) was there. She told a detective that the victim and the defendant had come out of the defendant's home together early one morning, probably in July or August.

Ms. Bickford said that she talked to law enforcement that after, just a couple of months after the victim's body was found. Additionally, she said she spoke with members of the victim's family, because the victim was a friend of hers and she was close to the victim's family.

**Rose Corbin** owned the Golden Jukebox in September 1990. She said Greenfield Trucking was located "just across the street, maybe a half of a mile or maybe not that far." She said she was working on the night of September 8, 1990, and they were very busy. She said that "Snake" Frazier was barred from the bar at that time and that she did not see him that night. She said the parking lot was very well lit. She said the defendant was in the bar that night. Additionally, she said the security guards broke up a fight at the bar between 12:30 and 1:00 that night. She testified that there were a number of different doors into the bar; that her employee, Lisa Zionchowski, left the bar around 2:45; and that she (Corbin) left between 3:00 and 3:15.

On cross-examination, Ms. Corbin said she never saw the victim at the bar that night nor did she see the defendant come into the bar. She said "Snake" Frazier was on the barred list because he was involved in a shooting at the bar and was supposedly the person who did the shooting. She said she knew Brenda Huggins as "Snake" Frazier's girlfriend but that Huggins was not barred.

She said she talked with the victim's family after the murder and, for a while, had a reward poster in the bar. She affirmed that the only time she saw the defendant at the bar was when he was

"hand popping" with his friends and having a good time. On redirect, Ms. Corbin said she did talk with the victim's family, but they did not intimidate her or get her to change anything she said.

**Cecelia Delacy** was a friend of the victim in 1990. She testified that the victim liked to party but was not an IV drug user. She said the victim was very friendly and outgoing and did not have any enemies or running battles with anyone. From a photograph of the victim, Ms. Delacey described a ring on the victim's finger as an oval black onyx ring with a gold band and gold slash across it. She said the victim was fond of the ring and would always have it on. She said the victim was flirtatious but did not sleep around.

She said that on the night in question, she met with the victim around 9:00, they had some beer and some marijuana and then left for the Golden Jukebox around 11:00. At the Golden Jukebox they saw the defendant, who she described as being friendly with the victim, with the defendant showing more attention to the victim than vice versa and seeming to like her "differently." She said the defendant bought them drinks and then around 12:00, the defendant and the victim went to another bar, Joe B's. She said she was going to Joe B's later and, as she was leaving the Golden Jukebox, she saw the defendant and the victim again. She went to Joe B's, then returned to the Golden Jukebox where she saw the defendant inside the bar around 1:00 or 1:30, and he told her he did not know where the victim was. She said she looked for the victim but left because she did not find her.

On cross-examination, she said she did not recall any problems the victim had with her boyfriend, Dwayne Clawson, other than everyday boyfriend/girlfriend problems. She said she did not know Brenda Huggins but remembered hearing about an argument between Huggins and the victim over "Snake" Frazier, Huggins' boyfriend. She said the victim "might" have told her about Brenda Huggins being jealous of her (the victim) with "Snake" Frazier. She admitted to doing drugs with the victim but could not recall what those drugs were. She said she believed the victim got the drug Dilaudid from Brian Johnson. She said she did not know where Brian Johnson got the drugs, but she remembered hearing about some drug store robberies about two weeks before this (the murder).

Ms. Delacy said that it was not uncommon for the victim to accept rides from people and that it was pretty standard for them to catch rides back and forth between bars. She said the victim probably had her purse with her on the night in question. She said the victim's boyfriend was in jail at the time for a drive-by shooting. She said that when she decided to go to Joe B's and saw the victim and the defendant in the Golden Jukebox parking lot, she did not see the victim in the defendant's vehicle. She said she went to Joe B's around 12:30 and 1:00 , stayed for maybe 30 minutes, and then came back to the Golden Jukebox, where she did not see the victim but did see the defendant.

**Dr. Gretal Harlan**, a forensic pathologist, testified that she performed an autopsy on the victim on September 13, 1990. She said the victim was five feet, five inches tall and would have weighed approximately 118 pounds when she died. She said that there was no scientific evidence

the victim was an IV drug user. She said she examined the body for injuries and found a number of stab wounds. She said there were puncture-type wounds in the right and left sides of her chest, likely caused by the same instrument. She said either wound could have been fatal. She said there was another stab wound above the belly button, and it also could have been a fatal wound. She said the victim also had two stab wounds in her neck area and a six-pointed, star-type damage to the front middle of her vertebra. Additionally, she found a stab wound to the breastbone area that only went through the skin. She said the wounds could have been caused by a six-sided tool, but she never had a satisfactory explanation for them.

Dr. Harlan, who said she knew of no medical tool that could have caused the wounds, was then shown a Torx screwdriver. She testified that the screwdriver could have inflicted the wounds. She said the victim's blood alcohol level could have caused her to be less cautious and more emotional at the time. She concluded that the cause of death of the victim was puncture-type stab wounds of the neck and chest.

On cross-examination, she testified that the fresh puncture wounds found on the body would have been made within one and a-half hours of her death. She said that the victim had a .15 percent blood alcohol level and that it normally takes about a .3 percent blood alcohol level before a person is unable to function. She said that the puncture wounds could have been made by the same instrument but that the other non-puncturing wounds were made by a different instrument. She said there were a number of other types of tools, including a nail punch and a chain saw, that she did not examine to see if they could have caused the wounds. She said she is not a tool expert but did not think an Allen wrench could have caused the wounds.

**Frank Bryan Johnson**, a friend of the victim, testified that they were part of a group of about ten to twelve people who smoked pot and experimented with drugs, but were not IV drug users. On September 9, 1990, he said he was working as a bounty hunter, was not in Clarksville, and had nothing to do with the victim's death. He said he was in Arkansas picking up a fugitive by the name he believed to be Russell.

He said that the victim left her purse at his residence or in his car "a day or two prior to that . . . ."[4] He said that when he went to return the purse to the victim, she was not at home so he gave it to Regina Austin. At the time of the murder, he said he was involved with the late night transportation of an individual he picked up through his bounty hunting. He testified that, along with his uncle and a friend, he investigated the victim's murder, confronted the defendant at the Golden Cue, and then witnessed the defendant get upset at this confrontation and assault his uncle.

On cross-examination, he testified that he had one roommate and that a number of people partied at his home and would sleep there, although he said he did not believe the victim ever slept there, she just left her purse there. He said he was very good friends with the victim, although he

---

[4] It is unclear whether he meant a day or two before the victim's death or a day or two before he returned the purse.

could not remember any particular jewelry she wore every day. He admitted to doing some private investigating of the case, even confronting the defendant at Greenfield Trucking where he said he possibly talked with the defendant's boss. He said he did not threaten the defendant, but was involved in an altercation with him at the Golden Cue where the defendant was upset with him that he was investigating. Additionally, he said he went to the Golden Jukebox and interviewed Alicia Zinkowski.

He said he knew Brenda Huggins and had seen her at bars. He said he knew the victim loved to party. He testified that he went to Atlanta with the defendant and Amy Jabdon but that he did not threaten Jabdon nor did he tell her to keep her mouth shut or she would end up like (the victim). He said the Robertson County detectives made it very clear that he had no business doing this investigating, referring to his helping investigate at the victim's family's request. He said he never told his old girlfriend, Lisa Zinkowski, not to talk to the police. He admitted to a brief sexual affair with the victim. He said he owned some Torx screwdrivers for use on his car.

**Earl Mullins**, the records custodian at the Montgomery County Jail, testified that on September 10, 1990, Stanley Lee Russell was booked in on a bond surrender. H e said there was no way he could tell who the bounty hunter was that brought him in. On cross-examination, he said it could have been either a bounty hunter or a bonding company that brought Russell in.

**Harold McCarver**, an acquaintance of the defendant in September 1990, testified that on September 8, 1990, he went to the Golden Cue, where he saw the defendant. He could not recall the exact time but said, as far as he could remember, that was the first time he saw the defendant that evening. He said he went with the defendant and got some liquor, then returned to the Golden Cue. He said they met some ladies, then went to his apartment where they smoked some marijuana and drank alcohol and then decided to go to the Golden Jukebox. He testified that the defendant drove. He said he was "pretty intoxicated" by the time he got to the Golden Jukebox and was unaware of any times. He said he left the bar around 2:00, 2:30, or 3:00, was wrongfully looking in the parking lot for his motorcycle, and concluded that the defendant went off and left him. He said he had very little memory of that evening in the early morning hours because he drank so much and smoked marijuana. He testified he went home with three ladies, passed out, and the next thing he remembered was being called down by Robertson County for questioning about the victim. He said he was interviewed by both Robertson County and the TBI and characterized the attitude of law enforcement was that he was covering up. He said that the victim's family did not pressure him and that any pressure came from law enforcement.

On cross-examination, Mr. McCarver testified that he first saw the defendant that evening at the Golden Cue but that he was not sure whether the defendant was at his home earlier in the evening watching football. Additionally, he testified about the pressure he felt from law enforcement, how they did not seem to believe he could have gotten as drunk as he said he was, and how he felt they thought he was involved (in the murder). He said he lost his job as a fire investigator due to this investigation.

On redirect, he said he spoke with the defendant after the investigation began, and the defendant told him that he told "them" that he was with him all that night. He said the defendant was not with him all night. On recross, he said that Robertson County led him to believe the defendant used him as an alibi but that the defendant never asked him to be an alibi.

**Judy Kennedy**, the defendant's landlord in 1990, testified that she rented him the basement apartment. She said that after the victim's body was found, the defendant did not stay at his apartment. She said she had a pass key but, at that time, was unable to get into his apartment with it. Afterwards, she said the defendant called to tell her he was moving and to tell her where a spare key was. She then gained access to his apartment.

She said she remembered a day the police came to search the defendant's apartment and that earlier that day, before the sun came up, she observed that someone had been in his apartment.[5] She said she heard water running, and this was maybe a week or two after the defendant had been gone. She said it was 3:30 in the morning, and she saw a truck belonging to the defendant's friend, Bill, in the defendant's parking place. She said two people left around 6:00 or 6:30. She said the water would run and stop during the time they were in the apartment.

Ms. Kennedy said that a search occurred at the apartment around 2:00 in the afternoon, and she spoke with the defendant. She said the defendant told her that somebody would be searching his apartment and that his friend, Bill, had pneumonia. She said she thought it was strange that someone with pneumonia would be downstairs running water. After the defendant moved out, she said she went back to repaint the concrete block shower. She said the shower had been painted around five times yet, when she inspected it after the defendant moved out, it was stripped down from paint and you could see the cement. She said she had never stripped the paint.

On cross-examination, Ms. Kennedy testified that the defendant was a good tenant who took care of his place and did not tear anything up. She said that Bill was a friend of the defendant's who visited the apartment at times. She said that anytime water would run in the defendant's apartment, when the toilet flushes, or the bathroom or kitchen sinks are use, she could hear it.

**Eric Waye**, a friend of Lisa Zinkowski, testified that he was a regular at the Golden Jukebox in 1990 and, on September 8, 1990, he was first introduced to the victim by her sister. He remembered there being a fight that evening, probably around 1:30. He said Lisa was slightly hurt, so they went outside and sat on a rock wall located outside the bar where Lisa told him what had happened. He said the victim was also sitting on the wall. He said that when he left the wall around 2:25 or 2:30 to find his ride, the girls were still on the wall talking. He did not know what they were talking about. He said that he found Mr. Davenport, his ride, and that when they left the bar, he did not see Lisa or the victim, although he said he was not looking for them. He said that when he was sitting with Lisa and the victim, he believed he remembered a small car drive up with four women

---

[5] It is unclear from her testimony exactly what day is being referred to.

in it, screaming at someone. He said he never saw the victim again after he went into the bar and found Mr. Davenport.

On cross-examination, he said he did not see the defendant outside the bar at anytime he was outside with the victim. He said while with the victim, another man walked up who was inebriated and was sticking his hand in his (Waye's) face wanting to make up. He said that the victim was encouraging him to make friends with the man and that he was not sure what happened to that man. He was unaware if anyone else came up to talk to the victim, except for the women yelling from the small car.

**Nancy Dudley**, also known as Nancy Williams, lived about six houses down from the defendant in September 1990. She said she was a good friend of the victim and an acquaintance of the defendant. She said she knew the defendant drove a big gray truck and that the truck was not parked in front of the apartment when she came home from a friend's house around 4:20 or 4:30 a.m. on the night in question.

On cross-examination, she said she did not check a clock but thought she left her friend's around 4:00. Referring to the relationship between the victim and the defendant, Ms. Dudley said she would say "they were pretty good friends." She said that on one occasion when she was with the victim at the Eagle's Roost bar, she saw Brenda Huggins saying things to the victim in a "highly disputed" conversation. She did not know if the subject of that was "Snake" Frazier. Additionally, she said one night she and the victim picked up the defendant in order to go to the Golden Cue, and when they stopped at Texas East, she witnessed an argument between the victim and her boyfriend, Dwayne Clausen. When she was presented with past statements she made to the investigators about witnessing the fight between the victim and Clawson and about the victim spending the night once at the defendant's, she said she could not recall making those statements.

On redirect, she said the truck was not gray, but gray and blue.

**Traci Presley** was playing cards with friends, Teresa Carpenter, Cindy Lyle (Coggins), and Cindy McClure, on the night of September 8, 1990. At approximately 2:00 in the morning , they drove in McClure's blue Yugo to get breakfast. After breakfast, she said they went to the Golden Jukebox, probably between 2:15 and 2:30, and the victim came over to talk to Teresa Carpenter. She said the victim was telling Carpenter that her ride left her, "that Brian f---ing left her." She said she could tell the victim had been drinking, and her speech was a "little slurish." Ms Presley said Teresa went inside the bar, the victim ultimately went around a corner of the building, and that was the last she saw of the victim.

On cross-examination, Ms. Presley said she never saw the victim get into anybody's car and never saw the defendant at all. She said she told the TBI that the victim additionally said, "Brian left me." She said she remembered telling Detective Perry that the victim's ride was Brian. Additionally, she said she never saw the defendant's truck pulling out.

**Cindy Lyle**, also known as Cindy Coggins, testified that on September 8, 1990, she was playing cards with her friends, Traci Presley, Teresa Carpenter, and Cindy McClure, when they decided to get something to eat, so the four of them left in McClure's blue Yugo. While out, they stopped at the Golden Jukebox because Teresa said she wanted to see who was there. She said Teresa introduced her to the victim, who was wearing a miniskirt, a little tank top, and a sheer blouse tied at her waist. She said it was approximately 2:15 to 2:30. She had no further conversations with the victim, and the last time she remembered seeing her was when the victim walked down the sidewalk to talk to Traci. She said she saw the defendant alone at the front door of the Golden Jukebox.

On cross-examination, she said she did not see the victim and the defendant together. She said that the victim told her that her ride had left and that she never heard her say who that ride was. She said the victim had not been in the bar before the defendant went in.

**Steve Scott**, with the TBI in firearms' identification, identified a mark on a bone as being caused by a Torx screwdriver. He said, after making comparisons, that it was a size 10 Torx that made the impression, although a size 15 could have made it as well, as both the size 10 and 15 were consistent in shape with the bone impression. He said he could not think of another type of tool consistent with the impression because the contour marks were consistent with a Torx. He concluded that the size 10 fit the impression better.

On cross-examination, Mr. Scott stated that he has never testified for the defense as a tool expert, although he had testified a few times as a firearm's identification expert.[6] He said the screwdriver he identified was a Matco brand, and there are unique characteristics. He said that when he examined the vertebra, there were no characteristics to identify the specific tool. He said he could not say with any certainty that the tool in question was the murder weapon. He said there are other types of six sided tools such as files, rasps, and Allen wrenches.

**Brenda Huggins** testified that in September 1990 she was in a long-term relationship with "Snake" Frazier. She said they were at the Clarksville (Montgomery) speedway on the night of September 8, 1990, arriving about 6:00 or 6:30 and staying until 11:00 or 12:00. After leaving the Speedway, she said they stopped to aid a troubled motorist for about an hour and then went home to 812 Forest Street. She said they passed by the Golden Jukebox on the way home, but did not stop. She said she arrived at home around 1:00 to 1:30, where they went to bed.

Ms. Huggins testified that "Snake" Frazier had been convicted in the past on drug charges and conspiracy to commit second degree murder.

She said that she had known the victim for three to five months in September 1990, having met her through her (the victim's) boyfriend Duane. Additionally she said that she and the victim

_____

[6] He said of the 200 times he was subpoenaed as a firearms expert, it was for the defense probably ten times.
.

-17-

had a good relationship.  She said there was one occasion when a problem developed between her and the victim over jealousy involving "Snake" Frazier.  After work one day, some men told her that "Snake" and the victim were riding around and drinking.  This made her jealous so she rode around looking for them.  She said she would have been upset if she had found them together, but she would not have killed Frazier.  She looked for them at hotels, found the victim at the Golden Jukebox, and had an argument with her through the car window.  She said the confrontation did not get physical, that she just ran her mouth at the victim and told her she "was going to whoop her every time I seen her."  She said that the victim cursed back at her, but that was the extent of the confrontation.

Ms. Huggins testified that, in the past, she had drug problems and felony convictions, including drug-related crimes and conspiracy to defraud the U.S. government.   She also said that back in 1990, she would pawn jewelry if she had some.

On cross-examination, Ms. Frazier was shown a document stating that the charge against "Snake" Frazier was actually accessory before the fact of a second degree murder.  She said she did not know, but she thought it was a conspiracy.  She said Frazier never told her he killed anybody because he did not kill anybody, despite her awareness of his pleading guilty to accessory to murder.  She said she and Frazier did not drink or do any drugs on the night of September 8, 1990, because Frazier does not like drugs.  She then admitted he has a drug conviction.  She said that with the exception of nine years, she had lived in Clarksville all of her life and that she had been to Port Royal.

She testified that the troubled motorists were a young couple in a jeep that had broken down, and that they took them to a Texaco station to get gas.  She said that probably took five or ten minutes.  She said she guessed they broke down on Needmore Road.[7]  She said Frazier had a work truck with some rope or chain in it, and he offered to pull the guy to the gas station.  She said that due to Frazier's tree trimming business, he carried chainsaw files and everything needed to operate a tree business.  She said she did not know what a Torx screwdriver was and never knew Frazier to work with one.

Ms. Huggins denied ever threatening to stab the victim, despite her being angry over the victim being with Frazier.  She said if another witness was to say that she (Huggins) threatened to stab the victim, that witness would be lying.  She said she never heard that Frazier tried to rape the victim.  She denied seeing a taxicab driver, Peewee Rittenberry, on the night in question.

**Aubrey Shaw** was a TBI forensic scientist in September, 1990.  At that time, he searched the inside of the defendant's vehicle and the inside of his apartment.  He collected carpet standards from the vehicle.  He said he collected carpet standards and conducted vacuumings of the apartment.

---

[7] Ms. Huggins was trying to remember the route they took that night so she was only able to guess they were on Needmore Road.

Overall, he testified that he collected ten items from the truck and over 140 items from the apartment.[8]

On cross-examination, he said he was looking for anything possibly connected to a murder by stabbing. He said that after he finished processing the vehicle for trace evidence, another examiner would have access to it to look for blood or fingerprints. He said a pair of gloves, a pair of waders, a fluorescent camouflage vest, and a straw still wrapped in paper were recovered from the vehicle.

He said a team of four individuals searched the home for hairs and/or fibers they thought would be relevant. Others searched for blood, hair, and fingerprints. He said that he believed the four of them searched the apartment for four hours and that more than 140 hair fiber samples were taken. He said they were looking, particularly, for a white and light blue shirt with dark blue shoulders.

**Barbara Williams** worked at the Elkton, Kentucky Piggly Wiggly grocery store in 1991, with the defendant's sister, Robin Wheeler. During this time, she said she met the defendant and his girlfriend, Peggy Shamwell. In May, 1991, she said Shamwell came to the store to show Robin a ring the defendant gave her, and Ms. Williams described it as "a black looking ring. Had diamonds– a diamond in it. Like an onyx." She said she observed the ring for about five minutes. Ms. Williams was shown Exhibit four, a picture of a girl with a ring. She said that the ring resembled the ring Peggy Shamwell had and that she did not see anything different about it.[9] She said she told the TBI about this and saw the ring several times.

On cross-examination, Ms. Williams said that the whole time Shamwell was showing the ring to Wheeler, she (Williams) was looking at the ring and was not involved in the conversation. She said that she did not know how many diamonds were in the ring, but that it looked like one. She said she heard on the news that there was a missing ring.

**Michael Breedlove,** a criminal investigator with the TBI, testified he has been the agent on this case since December 1990. He said he interviewed the defendant on December 13, 1990, asking him if he was with the victim the night of her disappearance. He said the defendant told him he was in the same building with her but was not with her. Breedlove testified that the defendant gave no responses to questions about his whereabouts on the night in question and that the defendant was angry and agitated about the investigation. He said the defendant denied that the victim had been in his car on the night in question and that he left the Golden Jukebox to go home around 2:00. He said the defendant said he "had nothing to do with the death of (the victim)."

---

[8] He actually said he would not be surprised in response to a question of whether he collected over 140 items.

[9] Exhibit #4 is a picture of the victim.

Breedlove testified that he showed the defendant a screwdriver removed from the defendant's home and told the defendant that they knew what the victim was killed with. He said the defendant became visibly upset, started shaking with his arteries going and lip quivering, and then wanted to end the interview.

He testified that on January 13, 1992, he interviewed Mike Greenfield, and Greenfield never told him he was at Port Royal on September 9, 1990, nor did he tell him anything about pulling his truck near the bridge across from where the victim was found. He said none of that was discussed.

Breedlove testified that the defendant had a two-toned silver and blue Chevrolet Silverado pickup truck in good condition, clean and "sharp."[10]

He said that on February 3, 1993, he went to Elkton, Kentucky to meet with the Kentucky State Police and to interview the defendant. He said he went to the defendant's apartment but did not see him, so he left a card and a note on the defendant's truck. Later, he said he saw the defendant on the town square, then he went back to the defendant's apartment with Detective Charvis from the Clarksville Police Department. The defendant came outside, and they had a very heated, angry conversation. He said the defendant was screaming obscenities and threats at him, telling him to leave him alone and that he was tired of him leaving his business card on his windshield. He said the defendant got within six inches of his face and threatened him, saying he was "going to beat the f--k out of me right now" and also threatening to kill him a multitude of times. He said he and Detective Charvis tried to calm him down. Breedlove said he did not draw his gun during the altercation but did tell the defendant that if he touched him or laid a hand on him he would put a bullet in his brain. He said that evidently someone called the police because they arrived shortly and calmed things down. Breedlove said this incident was the only time in his career that he really felt the person was going to kill him.

On cross-examination, Detective Breedlove said his primary reason for going to Kentucky was to brief the new detective there on the investigation. He said that after seeing the defendant on the town square, they headed to his apartment complex about half an hour later. Breedlove said they slowly drove through the complex and the defendant then came out of his home, which led to the confrontation. He said that when he initially wrote up the incident, he did not say anything about the defendant threatening to kill him. Additionally, he said the defendant did not have a weapon.

---

[10] At this point, the jury was excused and the court heard arguments concerning whether certain statements would be admitted into evidence. Some of these statements were admitted and are the subject of a separate issue raised by the defendant, namely whether the trial court erred in allowing the testimony of TBI Agent Mike Breedlove in violation of Tenn. R. Crim. P. 404(b), that the defendant threatened to break his neck?

Breedlove said he knew what kind of pressure the defendant was being placed under by the victim's family and was aware of flyers being posted in the apartment complex.[11]

He said that during the initial interview with the defendant, the Torx screwdriver Breedlove showed him did not have any blood on it and that he showed it to him toward the end of a short interview. He said that screwdriver, which was recovered from the defendant's apartment, was a size 15 and that they were not positive it was the murder weapon.

Breedlove said the victim's family was involved with the case and was interviewing witnesses. He said that while the family involvement created more work for him by doing things like creating more leads, he did not necessarily consider it a problem, as he understood what the family was going through. He said he was never informed of the possibilities that the victim's family was coercing witnesses into lying nor did he remember reading anything such as that in a report. He said it was "very possible" that some witnesses' statements may have been affected because that witness was being interviewed by an emotional family member. He said he did not have a problem with the victim's family retracing his steps and talking to witnesses after he had. He said he was unaware of whether Detective Green had problems with the family involvement, but Breedlove said he knew the family was pushing for TBI involvement. After being presented with one of the reports from his investigation which noted that he was having problems with the family's involvement, he said he did not remember any specific problems although it is clear that he included it in his report. Additionally, after reviewing the same report, Breedlove said he recalled a problem with witnesses being intimidated by the victim's family.

He said that nothing was found in the search of the "cave" where the defendant's truck had been or when a diver went into the water. Additionally, he said his investigation revealed a number of the victim's associates had criminal backgrounds and that some of them may not have wanted to talk to him because it might get them into trouble. Specifically, he said that the witness McCarver was being untruthful and was a very weak-minded individual.

He said that during the process of his investigation, he became aware that the ring portrayed in the reward flyers was not the actual missing ring, but was a ring purchased at Wal-Mart. He said the family told him the ring was purchased at Joy's Jewelers, and he tried to get names of customers who owned a similar ring.

He said he interviewed "Snake" Frazier due to his criminal history and outstanding warrants. He said Frazier, who had an alibi that was corroborated by Brenda Huggins, stated that they were at the races and helped someone with a flat tire. He said he did not have the names of the people who Huggins and Frazier claimed to have helped.

---

[11] The gist of the flyers was to help find the defendant for the victim's murder, and they were generated by the victim's family.

**Jeffery Fletcher** was a friend of the defendant's in Elkton, Kentucky. He said he knew the defendant for five or six years. He said that in 1994, he had an argument with the defendant, and the defendant told him "that he killed a girl from Clarksville." He said he thought the defendant was kidding. He said the defendant said, "He would stab my guts out . . . the same way he did her." He said he later told Jimmy Brumfield about the comment. He said at that time he was unaware of any reward for information about the murder. He said on February 20, 1997, he told TBI Agent Mike Breedlove about the comment. He said he has since become aware of the reward offer but has not claimed any reward or communicated with the victim's family. He admitted he was in jail for being convicted of theft over $300.

On cross-examination, he admitted that in a 1997 hearing, he said he had known the defendant for about seven or eight years. Additionally, he said that at a prior hearing he testified, in referring to what the defendant said to him, that "he told me that he had done one and he ain't scared to kill another one."[12]

Fletcher said he had a conversation with Ray McGowan where he (Fletcher) said he was the State's "star witness" and knew what the murder weapon was, a Phillips head screwdriver.

**Jimmy Brumfield** testified he remembered having a conversation with Jeffery Fletcher in 1996 or 1997.

**Karen Chowning**, Jeffery Fletcher's girlfriend, testified that she remembered a conversation between Fletcher and Brumfield about three to three and one-half years ago and that shortly after that time, the TBI came to interview both her and Fletcher.

On cross-examination, she said she was aware there was a reward for information about the murder. She said she remembered that right after the murder occurred, she saw a sign in Elkton. She did not remember any billboards but said she remembered a paper with the victim's picture on it, asking for information. She said that Fletcher said he knew there was a reward offered around that time. On redirect, she said she was unsure if Fletcher was aware of the reward.

**Patrick McCutchen**, a former district attorney, testified at the initial trial but died prior to the 2000 trial. His prior testimony was read into evidence and the following relevant evidence was adduced.

He testified that on March 11, 1993, the defendant and his father, John Willis, came to McCutchen's office for an interview. McCutcheon said he wanted to question the defendant about inconsistencies in prior statements made to Detectives Perry and Green. There was a hidden camera

---

[12] There were a number of questions establishing that, prior to this 2000 trial, this witness testified he had known the defendant for longer than the five or six years he testified to at the 2000 trial. Additionally, there were questions to establish slight discrepancies between the 2000 trial and previous appearances in the witness' description of what the defendant said to him. During redirect, Fletcher said he was unsure of the dates.

in a nearby lampshade. He said the defendant told him that he remembered being at Joe B's and the Golden Jukebox with the victim on the night in question and that the victim was in his truck that night. He said he confronted the defendant with evidence that his truck fibers were found on the victim and that is when the defendant recalled her being with him that night. He said the defendant told him he had sex with the victim.

He said to the best of his knowledge, the clothes worn by the defendant the night in question were never recovered. He said the defendant told him that the victim had been at his apartment on the night she disappeared. McCutchen said that the defendant was not very specific about the details of the evening in question. He said that, two or three times, the defendant denied killing the victim and said he would help find who did it if he could.

On cross-examination, McCutcheon said the defendant asked him if he was being taped and, despite the fact that he was taping him, he told the defendant no. He said the defendant told him he was scared when he was interviewing with Detective Perry and Green and that the detectives were harassing him. Additionally, he said the defendant told him he did not kill that girl.

He said the defendant expressed some embarrassment about discussing sex with his father present, said whether or not he had sex with her was nobody's business, and then said that he did. He said the defendant told him he was embarrassed by having pubic hair samples taken from him.

McCutchen testified that the defendant told him he did not know "Snake" Frazier, but Frazier's name came up in their conversations. According to McCutchen, the defendant told him that Frazier had done some favors for the victim and that Dwayne Clawson got mad about it. He said the defendant told him he was at the Golden Jukebox with the victim and could have used words to the effect that they went to Joe B's together. He said the defendant described a party place near the barn in the Port Royal area. Additionally, he said the defendant told him he was aware of a man who was put in jail for twelve years for a crime he did not commit, which explained why he was scared to talk earlier.

He said his impression from the defendant was that the defendant met the victim at Joe B's, left to change clothes, went to the Golden Jukebox, and then back to Joe B's.[13] He said the defendant "could have" told him that the Pancake House on Riverside was one of the places he went that night. He said the defendant did not tell him if anyone went to breakfast with him.

He said the defendant told him that no one else was going to talk to him and that he had already talked to a number of police officers and had his apartment, his truck, and his parent's home searched.

_____

[13] While it is confusing from a raw read of the trial transcript, it appears that McCutchen's impression as to the defendant's whereabouts were as follows: He met the victim at Joe B's; they both went to the Golden Jukebox; the defendant went back to Joe B's to talk to a girl; the defendant went back to the Golden Jukebox; and the defendant left the Golden Jukebox and went to breakfast.

**Kelly Jenkins** was declared an unavailable witness. Therefore, his former testimony from the 1997 trial was read into the record. The evidence adduced was as follows.

He said he worked with the defendant in Elkton, Kentucky and knew that the defendant had a blue and gray Chevrolet pickup truck. He said that while talking with the defendant, the subject of the victim going missing and being found dead came up, and the defendant told him "[t]hey would never prove nothing. They would never get a conviction." After that, Jenkins said he no longer associated with the defendant.

On cross-examination, he said he first reported this conversation to law enforcement in the summer of 1996. He said he was unaware of any reward at that time. He said he became aware of the reward later and knew of advertisements from flying planes, television reports, and general topic of discussion in the area. He said the discussion with the defendant occurred in 1990. He said he was aware the reward was up to $27,000. On redirect, he said he did not apply for the reward.

**James Violette** testified he was drinking with Mike Greenfield at the Port Royal job site around 2:00 or 3:30 on Sunday afternoon, September 9, 1990. He said he did not see any tire tracks. On cross-examination, he said there was other equipment at the job site and that the TBI came to him and told him to "come down here."

**William Alley** was recalled to testify.[14] He said he did not see any tire tracks late in the afternoon, after 5:00 and before dark, on September 8, 1990, but he did see tire tracks at approximately 10:00 the next morning.

**Teresa Carpenter**, formerly Teresa Merchant, testified that she worked with Brenda Huggins in 1990 and that she was aware that Huggins had hard feelings for the victim because Huggins thought the victim was running around with "Snake" Frazier, Huggins' boyfriend. She said that Huggins had a bad temper and that one night she rode around with Huggins while they looked for evidence that the victim and Frazier might be together.

She said that on the night in question, she was playing cards with some friends when they went to get breakfast around 1:30 or 2:00 in the morning. They stopped at the Golden Jukebox while they were out. They rode in Cindy McClure's blue Yugo. She said she saw the victim in front of the bar. She said the victim told her she was looking for the defendant because she needed a ride to Joe B's to get her car. Carpenter said that she saw the defendant's truck leaving the Golden Jukebox parking lot and that the victim said, "There goes my ride." Carpenter said she thought that the defendant's truck was bluish and two-toned and that he headed toward Joe B's when he left. She said she spoke very briefly with the victim after this and then went back into the Golden Jukebox. She said she did not see Brenda Huggins, "Snake" Frazier, or his truck. She said she was in the bar for possibly five or ten minutes, and she did not see the victim when she came outside again. As she

---

[14] The defendant objected to this recall of Alley. The court allowed it for the limited purpose of establishing times. The defendant appealed this ruling, and we will address it later.

went to get into her car, she again saw the defendant's truck leaving the bar and driving toward the direction of Joe B's. She said she was unable to see if anyone was in the passenger seat.

On cross-examination, she testified that she did not see the defendant outside the bar holding the door for other patrons and that she would question it if someone else said they did. Additionally, she said she did not know if the victim came into the bar after she did for the five or ten minutes. She was asked if she recalled her earlier testimony regarding the time she was at the Golden Jukebox and her response to the question, "Could it have been around midnight?" She answered, "I may have been after, but I wasn't for sure." She again said she did not see the victim in the defendant's truck.

She said when she was first questioned in December of 1990, she told the TBI about an incident when Brenda Huggins tried to jump on the victim, about Huggins' temper, and about the night she rode around with Huggins looking for Frazier and the victim.

On redirect, Ms. Carpenter said she was really sure the events she discussed happened very close to the time the bar closed.

The defendant's motion for a judgement of acquittal was denied.

**Defense**

**Peggy Burke**, formerly Peggy Shemwell, testified that she dated the defendant from 1991 until, roughly, 1998. She said the defendant gave her two rings, one was a gold band with a cluster of diamonds on top and the other had five diamonds across the top, while they dated. She said he never gave her a black onyx ring with a diamond and gold slash in it nor has she ever possessed such an item nor ever shown such an item to Robin Wheeler.

She testified that everywhere in the Elkton, Kentucky area, there were flyers showing the defendant's picture and offering a reward for information about this case. Additionally, she said she saw a billboard showing the defendant's picture in Clarksville and saw things about the reward on television, in newspapers, and on a banner flying from an airplane.

On cross-examination, she said she was unaware of any reward money. She said that she knew Barbara Williams at the time she worked at the Piggly Wiggly with the defendant's sister and that, as far as she knew, Ms. Williams had no reason to lie.[15]

**Robin Wheeler**, the defendant's sister, testified that she recalled seeing flyers showing the victim's picture and offering rewards for the arrest and conviction of the person that killed her. She said the flyers had a picture and a description of the victim's black onyx ring. Additionally, she said there were flyers at her brother's apartment complex. She said she never saw her brother possess

---

[15] Ms. Williams earlier testified that Burke/Shemwell showed off a black onyx ring.

a ring similar to the one described in the flyers nor did she ever see Peggy Shemwell in possession of a similar ring.

**William Welch** testified that in the summer of 1990, he drove a gray 1986 Ford pickup truck and knew and worked with the defendant. He said he usually picked the defendant up at his apartment for work between 5:00 and 5:15 in the morning. He said he never went by the defendant's apartment at 3:30, 4:00, or 4:30 in the morning. Additionally, he said he never cleaned out the defendant's apartment. On cross-examination, he said he did not know Harold McCarver.

**James Rittenberry**, a Clarksville area taxi driver in September, 1990, testified that at 2:21 in the morning on September 9, 1990, he received a call for two fares from the Golden Jukebox. He said when he arrived at the Golden Jukebox to pick up his fares, he got out of his taxi and recognized ""Snake"" Frazier, Brenda Huggins, Gayle, and the victim in the parking lot. He said "Snake" had a bad reputation. He said he recognized the victim because he had previously seen her at Frazier's house. He said he heard Brenda Huggins say to Jamie, "Quit f---ing with "Snake" because she was "going to get hurt and get hurt bad." He said he then went into the bar, found his fares, and delivered them to their location. He produced documentation to that effect.

On cross-examination, he said he was sure he received the call at 2:21 because he knew how long it took him to get to the Golden Jukebox and he arrived there maybe between 2:25 and 2:30. He said he went to the Golden Jukebox a number of times throughout the week to pick up fares and he was familiar with "Snake" Frazier even before that night. He said he knew this occurred on the night in question because he went to work on September 8 and this happened after midnight. He said that he had previously gone to Frazier's house and the victim was there.

He said he did not see a Yugo at the Golden Jukebox on the night in question. He described the victim as being tall and slender and said he would be able to identify her from a picture. He subsequently identified her from a picture and, when asked why he was unable to do that previously, he said he did not have his glasses.

On redirect he produced a receipt for gas that showed an arrow pointing to the Golden Jukebox.

**Joseph Lingauer**, who was often known as "DeVito," testified that he was at the Golden Jukebox on September 8, 1990, and that he heard about a fight between "Kelly Elliott and Lorie Hamilton." He said he spoke with the victim outside the bar around 9:30 or 10:00 and then saw her again after the fight about 11:30 or 12:00. He said he had driven them to the store for cigarettes earlier in the evening . He said he left the Golden Jukebox by himself that night around 12:30 or 1:00.

On cross-examination, he said that he and the victim were only friends and that he actually knew her sister, Gina, better. He said he may have smoked one or two joints that night and probably drank two or three beers. He said he left the bar around closing time, despite the fact that some

people said the fight was around 12:30 and 1:00, and also said he left about an hour to an hour and a-half after the fight. He then said he left around 1:00 to 1:30. On redirect, he said that Teresa Merchant was lying if said she talked to him around 2:20 or 2:30.

**Gina Marable**, the victim's sister, testified she told Detective Perry that her sister was wearing a black onyx ring with a big opal in it. She said she told the detective that her sister pawned a lot of jewelry. She said she was unaware of any problems between her sister and Brenda Huggins, but also said that Huggins was "a lot of talk and no walk." After being presented with some prior statements, Marable then said that the victim was afraid of Brenda Huggins but that the statement she was shown was made when Stephanie beat her up.

On cross-examination, she said she was very emotional when she made those earlier statements because they were taken right after the victim was killed.

### Sufficiency

The fact that the defendant was with the victim on the night she was murdered seems uncontroverted. The crime scene was a relatively short drive from the Golden Jukebox, the last place the victim was seen alive. The victim's body was found near Port Royal Bridge close to Port Royal State Park. The defendant enjoyed Port Royal State Park and often took his girlfriends there. One of the accesses to Port Royal State Park was across the Port Royal Bridge, where the victim's body was found. The Port Royal Bridge was closed to the general public because of construction, yet travelable to those who were willing to drive around the barricades. Greenfield Trucking, the defendant's employer, was laying a road near the Port Royal Bridge, and several pieces of their equipment were present at the site. The victim's body was found 21 feet off the roadway, near the Port Royal Bridge and the Greenfield paving site.

A rational jury could infer from the evidence above that the defendant was familiar with the area where the victim's body was found and that he would have particular knowledge that the area was closed to the general public because of the barricades.

The victim's mother testified that the defendant acted calm when she confronted him with the fact that her daughter was missing, while everyone else had acted very concerned. A search of the defendant's truck shortly after the murder found no latent prints, and the truck was described as very clean and recently washed. It is unusual to find no latent prints in a vehicle. A search of the defendant's apartment and his father's home failed to recover the clothing the defendant was said to be wearing on the night of the murder. Moreover, before the search of his apartment, his neighbor testified to hearing water running throughout the night. A search of the apartment revealed a very scrubbed, clean shower. The defendant's landlord testified that the shower had been painted around five times, yet when she inspected it, the shower was stripped down from paint and you could see the cement. The landlord also said the defendant moved out of the apartment after the victim's body was found.

From the above evidence, a rational jury could infer the defendant's behavior was consistent with that of a guilty individual covering his tracks; specifically, the defendant was cleaning both his truck and his apartment to cover up or destroy evidence of the crime.

The victim was known to wear a particular black onyx ring. A similar looking ring was later observed being worn by the defendant's girlfriend. A proper inference could have been made that the defendant took the ring from the victim and then later gave it to his girlfriend.

Several experts determined that the death was cause by puncture wounds and that a Torx screwdriver could have inflicted those wounds. The defendant had access and knowledge of that type of tool. A size 15 Torx screwdriver was recovered from the defendant's apartment. The defendant appeared visibly shaken when confronted with the fact that the police determined a Torx screwdriver was the murder weapon. The inference that this was a crime of opportunity where the defendant grabbed the nearest available weapon, namely a Torx screwdriver, is a rational one for a jury to make.

There were a number of inconsistencies in the defendant's explanations to law enforcement in areas such as his whereabouts on the night in question. While the defendant explained this as being scared about the investigation, the jury was free to reject his explanation. Three specific inconsistencies were evident that could have allowed a jury to infer behavior consistent with guilt. First, the defendant stated to detectives that the last time he saw the victim was after he dropped the victim off at the Golden Jukebox when they came from Joe B's. However, there was also evidence introduced that carpet fibers consistent with those from the defendant's truck were found in the victim's panties and bra. The defendant admitted to Patrick McCutcheon that he had sex with the victim on the night she was murdered. A rational jury considering all the evidence could properly conclude that the most logical time for the defendant and the victim to have engaged in sex was after they left the Golden Jukebox together. As such, a jury could have inferred that the defendant was being untruthful about his actions with the victim that night and did see her again after he said he dropped her off for the last time at the Golden Jukebox. Second, Patrick McCutchen testified that in his interview with the defendant, the defendant gave the impression to him that he had minimal knowledge about the Port Royal area. However, other evidence established that the defendant was familiar with that area, that he took his girlfriends there, and that he worked for Greenfield Trucking which had a job site set up within a few hundred yards of where the victim's body was found. Third, there were inconsistencies in the defendant's use of Harold McCarver as an alibi, as McCarver's recollection of their time spent together that night differed from the defendant's. The jury could have inferred that the defendant was deceitful or untruthful and that this behavior was consistent with covering up his actions on the night in question.

There was evidence produced that the defendant threatened one of the case investigators when the investigator confronted him at his apartment in Kentucky. Again, the jury was free to reject the defendant's explanation that he was tired of being harassed and could have credited the version that his anger was consistent with the actions of a guilty person.

-28-

Perhaps the most damaging evidence came from Jeffery Fletcher, who testified that the defendant told him he had killed a girl in Clarksville and he would "stab his guts out the same way he did hers." It is within the jury's discretion to credit and weigh the credibility of witnesses and, obviously, they would be able to determine that the defendant killed the victim if they believed Fletcher. Additionally, there was testimony from Kelly Jenkins that the defendant said they would never get a conviction. If the jury credited Fletcher's testimony and rejected any testimony from others that may have refuted Fletcher's, then the inference is clear that the defendant killed the victim and then later, in a fit of anger, told someone else.

No single piece of evidence served to convict this defendant. The tapestry of circumstantial evidence was woven thick enough that a rational jury could have inferred that the defendant was with the victim the night in question, desired the victim, came back to the Golden Jukebox late that night, convinced the victim to get back into his truck, took her to Port Royal State Park where something went wrong, leading him to grab the nearest weapon, and kill her. Furthermore, there was sufficient evidence to support the inference that the defendant's behavior after the murder, his inconsistent stories, his threatening of investigators, his moving away shortly after the murder, and his obsessive cleaning of his truck and the shower in his apartment was the behavior of one that committed a crime, was leaving the overall scene, and was covering his tracks.

Additionally, a rational jury could have rejected any alternate theories as to who killed the victim. The defendant attempted to portray Brenda Huggins and "Snake" Frazier as possible suspects. However, it was not beyond a rational jury to conclude that based upon the evidence, Frazier and Huggins did not make contact with the victim on the night in question. The jury was free to believe the testimony that Huggins and Frazier were at the races on the night in question, helped a motorist that same night, and were not in position to kill the victim. The jury was in the best position to evaluate the credibility of the witnesses, and it was not an irrational decision for them to reject the testimony of the taxi driver James Rittenberry, who said that Huggins and Frazier were at the Golden Jukebox the night in question. There was insufficient evidence presented to make it error for a jury to exclude all alternative theories of who killed the victim.

The State's theory was that the defendant was into the bar and drinking scene and was interested in the victim. They posit that the circumstantial evidence proved beyond a reasonable doubt that the defendant was with the victim the night in question, drove her in the late hours to Port Royal, and then decided to kill her using a weapon of opportunity, namely, a nearby Torx screwdriver. The inferences the jury made based on the circumstantial evidence presented were not irrational or improper. We conclude the evidence was sufficient to support the guilty verdict for second degree murder.

### II- Second Degree Murder is a Lesser Included Offense of Felony Murder

In Tennessee an offense is a lesser included offense if:
(a) all of its statutory elements are included within the statutory elements of the offense charged; or

     (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
       (1) a different mental state indicating a lesser kind of culpability; and/or
       (2) a less serious harm or risk of harm to the same person, property or public interest; or
     (c) it consists of
       (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
       (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
       (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 2001).

Our supreme court recently applied the Burns analysis and determined that second degree murder was a lesser included offense of first degree felony murder, stating:

> After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser included offenses of felony murder under part (b) of the Burns test.

State v. Ely, 48 S.W.3d 710, 721-22 (Tenn. 2001).

The defendant's argument that second degree murder is not a lesser included offense of felony murder because it requires a *greater* level of mental state as per culpability is rejected by the Ely analysis. We are bound by Ely and conclude that second degree murder is a lesser included offense of felony murder. Having concluded this, we additionally conclude the trial court did not err in failing to dismiss.

### III-Recall of William Alley

The State originally called William Alley, who testified in general terms that on Saturday, September 8, 1990, he did not see any tire tracks at the Port Royal murder scene, but on Sunday, September 9, 1990, he did see tracks. Subsequently, Michael Greenfield testified that he went to his job site at Port Royal on Sunday to check on things and that he drove his truck near the scene. James Violette testified he met Greenfield that Sunday, around 2:00 to 3:30 in the afternoon. Afterwards, William Alley was recalled by the State in order to give more specific times. He then testified that he saw no tracks around 5:00 in the afternoon on Saturday but saw tracks around 10:00 the next morning.

The defendant contends the trial court erred in allowing this recall, that essentially the State was given a "second bit at the apple," in reference to Alley's testimony concerning the times the tire tracks may have been made. We disagree. The trial court did not err in allowing Alley to be more specific and clarify his prior general testimony.

In State v. Caughron, our supreme court stated, "Allowing the recall of a witness is left to the sound discretion of the trial judge, whose decision will only be disturbed upon a showing of abuse of discretion." 855 S.W.2d 526, 539 (Tenn. 1993). We conclude there is no abuse of discretion in allowing a witness to clarify and make his own prior general testimony more specific. Accordingly, we conclude there was no error by the trial court.[16]

## IV- Allowance of Testimony by Agent Breedlove That the Defendant Threatened Him

The defendant contends the trial court erred in allowing Detective Breedlove to testify that the defendant threatened him. His primary contention is that such evidence was unfairly prejudicial to him. The State argues that this issue was already decided on the first direct appeal, is therefore the "law of the case," and that, additionally, the defendant's actions were relevant as evidence of actions that are probative of one's guilt.

We agree with the State that this issue was raised and decided on the first appeal. In the first appeal, the defendant raised the following issue: "Whether the trial court should have excluded testimony of a TBI agent that Willis threatened to snap his neck . . ." State v. Willis, No. 01C01-9802-CC-00068, 1999 Tenn. Crim. App. LEXIS 715, at *1 (Tenn. Crim. App. July 15, 1999, at Nashville) perm. to appeal (denied Oct. 23, 2000). This court concluded that the evidence was circumstantially probative of the defendant's guilt, that the probative value was greater than its prejudicial effect, and that the evidence was properly admitted. Id. at *11.

> As such, that decision is the law of the case. As our supreme court recently stated: The phrase 'law of the case' refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

---

[16] We disagree with the State's assertion that the defendant waived this argument for failing to cite authority, as per Rule 10(b), Rules of the Court of Criminal Appeals. Rule 10(b) states, "Issues which are not supported by argument, citation to authorities, *or* appropriate references to the record will be treated as waived by this court (Emphasis added)." Rule 10(b) can be satisfied by other methods than just citing to authority, and the disjunctive wording is evidence to that effect. While we disagreed with the defendant, he nonetheless supported his issue with appropriate references to the record and with supportive argument. Accordingly, we addressed this issue as one of the trial court not abusing its discretion and not as being waived.

Memphis Publg. Co. v. Tennessee Petroleum Underground Storage Tank Board, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted).

The issue raised in the defendant's present appeal was "whether the trial court erred in allowing TBI Agent Mike Breedlove to testify that the defendant threatened to beat and kill the detective . . ." This is substantially similar, if not figuratively identical, to the issue raised in the earlier appeal. The "law of the case" doctrine applies, and we, therefore, conclude that this testimony was properly admissible and this issue is without merit.

## V- Sentencing

The defendant was convicted of second degree murder, a Class A felony, and sentenced as Range I, standard offender to 25 years in the Tennessee Department of Correction. The defendant contends that despite 25 years being within the applicable sentencing range, the trial court erred in finding no mitigating factors and in giving excessive weight to the enhancement factors.

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments. In conducting our review, we are required, pursuant to Tenn. Code Ann. § 40-35-210, to consider the following factors in sentencing:

(1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

If no mitigating or enhancement factors for sentencing are present, Tenn. Code Ann. § 40-35-210(c) provides that the presumptive sentence for most offenses shall be the minimum sentence within the applicable range. State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). However, if such factors do exist, a trial court should start at the minimum sentence, enhance the minimum sentence within the range for enhancement factors, and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Leggs, 955 S.W.2d 845, 848 (Tenn. Crim.

App. 1997); see Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Comments. Nevertheless, should there be no mitigating factors, but enhancement factors are present, a trial court may set the sentence above the minimum within the range. Tenn. Code Ann. § 40-35-210(d); Lavender, 967 S.W.2d at 806; Manning v. State, 883 S.W.2d 635, 638 (Tenn. Crim. App. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. Fletcher, 805 S.W.2d at 789.

**Application**

The sentencing range for a Range I offender, Class A felony, is between 15 and 25 years. Tenn. Code Ann. § 40-35-112(a)(1). The presumptive sentence for a Class A felony shall be the midpoint of the range. Id. § 40-35-210(c). To determine the specific sentence, the court then considers, *inter alia*, mitigating and enhancement factors presented by the parties. Id. § 40-35-210(b)(5). The trial court made the following findings and found the following enhancement factors as set out in Tennessee Code Annotated section 40-35-114:

(1) The defendant had a previous history of criminal history in addition to those necessary to establish the appropriate range. The court found that the presentence report established prior convictions for aggravated assault and assault.

(5) The defendant treated the victim with exceptional cruelty. The trial court found this to the extent there were multiple stab wounds.

(8) The defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. The court found that the defendant was placed on probation for his aggravated assault conviction and that he violated that probation based on a DUI conviction.

(9) The defendant possessed a deadly weapon during the commission of the offense. The court found that second degree murder could be committed without a deadly weapon, yet found in this case a deadly weapon was used. The court found that a Torx screwdriver was used, and therefore applied this enhancement factor.

(11) The felony resulted in death or bodily injury and the defendant had previously been convicted of a felony that resulted in death or bodily injury. The court found this based on the prior aggravated assault conviction.

(13) The felony was committed while the defendant was on probation. This homicide occurred while the defendant was on probation from his aggravated assault conviction.

The trial court found no mitigating factors. The defendant argues that the trial court abused its discretion in rejecting any mitigating actors and then weighing the enhancement factors as to sentence the defendant to the maximum sentence within the range. He claims the trial court "summarily rejected" the evidence offered for mitigation, to wit; the defendant's consistent work

-33-

history, strong family support, length of incarceration, and ability to be rehabilitated. However, the defendant does not offer an argument to indicate why the trial court's rejection of any mitigating factors was an abuse of discretion. The burden is on the defendant to show that sentencing was improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments. Having failed to offer anything more than the bare boned argument that the trial court abused its discretion by rejecting any mitigating factors, the defendant has not met his burden.

We conclude that enhancement factor (5), the defendant treated the victim with exceptional cruelty, should not apply. All murders have an inherent cruelness to them, and the only evidence the trial court mentioned in its findings as to this factor was that there were "multiple stab wounds." Due to the inherently cruel nature of all murders, we cannot conclude that a finding of "multiple stab wounds," standing alone, is adequate to satisfy this factor. Nonetheless, despite the misapplication of the exceptional cruelty factor, we cannot conclude the trial court abused its discretion in the weighing of the other enhancement factors, of which we conclude all were applied appropriately. No particular weight to any enhancement factor is prescribed by statute. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986). Additionally, the trial court complied with the purposes and principles of the sentencing act, pursuant to Tennessee Code Annotated section 40-35-210. The trial court submitted support for its other findings, indicating that it did consider the evidence, the presentence report, the principles of sentencing, the nature of the conduct, and the enhancement and mitigation evidence. The defendant did not make a statement at the sentencing hearing. Because no particular weight is prescribed to any enhancement factor, the court was free to consider the enhancement factors as a whole and to sentence accordingly, which it did.

Our review reflects that the trial court followed the statutory sentencing procedure, imposing a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and that the trial court's findings of fact are adequately supported by the record. As such, we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Accordingly, we affirm the sentence imposed by the trial court.

### Conclusion

Based on the foregoing, the defendant's second degree murder conviction is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE